FILED

2019 FEB 15  PM 3: 33

BARBARA A. WIEDENBEIN
CLERK OF COMMON PLEAS COURT
CLERMONT COUNTY, OH

## IN THE COURT OF COMMON PLEAS OF CLERMONT COUNTY, OHIO

O'DONNELL MEDICAL
INDUSTRIES, INC.,
1120 Springridge Court
Milford, Ohio 45150,

2019 CVH 00234  JUDGE BROCK

                          Plaintiff,

Case No. _____

# JUDGE BROCK

        v.

ANIMAL REFERENCE
PATHOLOGY, LLC,
C/O Statutory Agent
John A. Gardiner
525 East 4500 South Ste F200
Salt Lake City, Utah 84107

Judge _____

And

**JURY DEMAND ENDORSED
HEREON**

ZNLABS, LLC,
C/O Statutory Agent
CT Corporation System
306 West Main Street - Suite 512
Frankfort, Kentucky 40601

                          Defendants.

## COMPLAINT OF PLAINTIFF O'DONNELL MEDICAL INDUSTRIES, INC.

For its complaint against Defendants Animal Reference Pathology, LLC ("ARP") and ZNLabs, LLC ("ZN"), Plaintiff O'Donnell Medical Industries, Inc. ("O'Donnell") states as follows:

1.      O'Donnell is an Ohio corporation owned by Sean Flynn and Steven DeMaio with its principal place of business located in Clermont County, Ohio.   O'Donnell is a

"Sales representative" under Section 1335.11(A)(3) of the Ohio Revised Code because it contracts with principals to solicit orders for services and is compensated, in whole or in part, by commissions.

2.     Defendant ARP is a Utah limited liability company with its principal place of business in Salt Lake City. ARP provides pathology laboratory services in veterinary medicine to its customers. David W. Gardiner is ARP's Chief Medical Officer and Chief Executive Officer. Frank Everett Smith is ARP's President and Chief Operating Officer.

3.     ARP is a "Principal" under Section 1335.11(A)(2) of the Ohio Revised Code because ARP: a) is in the business of providing services to customers; b) utilizes one or more sales representatives to solicit orders for those services; and c) compensates the sales representatives in whole or in part by commission.

4.     Defendant ZN is a Kentucky limited liability company organized on July 18, 2017 with its principal place of business in Louisville, Kentucky. ZN is a reference laboratory that provides diagnostic services in veterinary medicine. David W. Gardiner is ZN's Co-Chief Medical Officer and Chief Pathology Officer. Frank Everett Smith is ZN's Chief Financial Officer. Gardiner and Smith are both members and co-founders of ZN and remained officers at ARP after ZN was founded.

5.     Prior to May 2016, the market for diagnostic laboratory services available to veterinary hospitals and clinics was dominated by a few major providers that only offered long term contracts. Although these contracts were unpopular with most customers, the diagnostic services market was a classic oligopoly with a small number of providers controlling most of the market on one side protected by significant entry barriers and a very large number of purchasers with no market power.

- 2 -

6. One of the most significant barriers to new suppliers entering the market was the difficulty of quickly landing sufficient customers to achieve economies of scale created by two primary factors.

7. First, a majority of the potential customers had long term contracts that expired at different times. Second, the marketing expense of contacting a large number of potential customers to identify those with expiring contracts was simply uneconomical given the small revenue generated by each customer.

8. O'Donnell's principles, Sean Flynn and Steven DeMaio, were very familiar with the challenges presented by this market structure based on their extensive experience marketing health care products to medical practices.

9. After a thorough investigation of the market for diagnostic laboratory services for veterinarians, O'Donnell identified sales channels that could significantly reduce the marketing barrier by capturing a significant number of customers through a contact that owned a growing number of clinics and hospitals ("Channel 1").

10. Another sales channel cultivated by O'Donnell was a growing veterinary cooperative that pooled its members' purchasing power to provide discounts on a variety of products and services which would enable O'Donnell to reach a large number of potential customers through a single point of contact ("Channel 2").

11. O'Donnell proceeded to invest considerable resources in developing relationships with the contacts they identified and developed an in-depth understanding of both their basic needs and preferences in evaluating testing services.

12. For instance, the ability to retrieve routine diagnostic test results over the internet by 9:00 am the following day was regarded as critical. O'Donnell determined that

- 3 -

the only way to satisfy this requirement to locate the testing lab near one of the hubs operated by UPS (Louisville) or FedEx (Memphis).

13.     Based on its research, O'Donnell determined that there was a real opportunity for a new competitor to capture a substantial share of the market and become the second or third ranked provider within a just few years.  As a result, O'Donnell turned its attention to identifying potential entrants with the necessary technical expertise to benefit from O'Donnell's research, marketing services, and especially the relationships it was building with contacts who could provide access to large groups of customers.

14.     O'Donnell identified ARP as a company that provided a subset of laboratory services to a limited customer base but had the technical expertise and resources to potentially develop the opportunity and contacts identified by O'Donnell.

15.     After ARP expressed interest in O'Donnell's proposal and requested access to the confidential information developed by O'Donnell, the parties executed a Non-Disclosure Agreement (the "NDA") on or about May 16, 2016 whereby ARP agreed not to disclose or utilize O'Donnell's confidential information without receiving O'Donnell's written consent.  A true and accurate copy of the NDA is attached hereto as Exhibit 1.

16.     The NDA provided for the application of Ohio law and the exclusive jurisdiction of the state and federal courts located in Ohio.

17.     Pursuant to the NDA, O'Donnell disclosed confidential information regarding the opportunity it had identified including detailed information regarding the contacts that O'Donnell was continuing to cultivate.

18.     ARP was impressed to learn that O'Donnell had access to Channel 1 because it had ignored repeated overtures from ARP over several years.

- 4 -

19. Since ARP was based in Utah, O'Donnell repeatedly emphasized the need to locate a laboratory near an overnight delivery hub based on what it had learned from potential customers. Based on the information disclosed by O'Donnell, ARP decided to pursue O'Donnell's proposal.

20. On or about September 22, 2016, ARP proposed a compensation structure for O'Donnell that included both commissions on sales developed through O'Donnell's contacts plus equity in ARP if certain revenue levels were achieved and O'Donnell promptly accepted (the "2016 Agreement"). A true and accurate copy of the 2016 Agreement is attached hereto as Exhibit 2.

21. In the course of developing these relationships, O'Donnell identified Partners 1 and 2 who could provide critical data to mature a new technology being developed by a potential partner of ARP, Techcyte, Inc. ("Techcyte"), that had the potential to provide a significant competitive advantage in the diagnostic testing market, especially for a new competitor entering the market.

22. In early 2017, O'Donnell proceeded for introduce ARP to its contacts including Channel 1 who echoed O'Donnell in explaining the importance of receiving results by the following morning. ARP responded that it was prepared to address that concern. After the initial introduction arranged by O'Donnell, ARP traveled to Channel 1's facility for a follow-up meeting. O'Donnell was neither invited to this meeting nor provided with a detailed report.

23. In May 2017, ARP asked O'Donnell to reduce its commissions under the 2016 Agreement for Channel 2 because it was expected to generate lower margins and O'Donnell promptly agreed to help ARP rapidly expand its customer base (the "2017

- 5 -

Amendment" and, together with the 2016 Agreement, the "Comp Agreements").  A true and accurate copy of the 2017 Amendment is attached hereto as Exhibit 3.

24.     During the summer of 2017, O'Donnell also introduced ARP to Partners 1 and 2 who could provide critical date that would enable  Techcyte to develop its technology and thereby put ARP in a position to have early and potentially exclusive access when it became available.

25.     By the fall of 2017, O'Donnell found itself largely excluded from ongoing discussions with the contacts its had shared with ARP under the NDA.

26.     For more than a year, O'Donnell invested considerable resources developing marketing strategies, cultivating relationships with customer contacts and introducing those contacts to ARP in reliance on the NDA and the Comp Agreements. During this time, ARP asked O'Donnell's owners to identify themselves as ARP representatives and thereby raise ARP's profile.

27.     In July 2017, Gardiner and Smith organized ZN near the UPS hub in Louisville Kentucky in order to exploit the opportunity identified and developed by O'Donnell . ARP, Gardiner and Smith never disclosed the existence of ZN to O'Donnell. Less than four months later when ZN was ready starting operations, ARP abruptly terminated O'Donnell's services and purported to cancel the Comp Agreements.

28.     ARP provided confidential information it received under the NDA to ZN to facilitate the exploitation of the opportunity O'Donnell presented to ARP by utilizing the contacts to potential customers developed by O'Donnell to sell diagnostic laboratory services.

29. By virtue of Gardiner and Smith holding positions at both ARP and ZN, ZN had actual knowledge that the confidential information provided by O'Donnell was subject to the NDA.

30. ZN's website offers the same diagnostic laboratory services that O'Donnell identified and worked to develop for ARP. Upon information and belief, ZN is an alter ego and/or successor of ARP for purposes of the NDA and Comp Agreements as reflected by its overlapping ownership. True and accurate copies of pages from ZN's website are attached hereto as Exhibit 4.

31. On or about January 21, 2019, Techcyte issued a press release announcing the launch of its AI powered "Vetcyte" digital diagnostic platform that touted its collaboration with ZN and stated that ZN could provide secondary opinions on test results. A true and accurate copy of Techcyte's press release is attached hereto as Exhibit 5.

32. By transferring O'Donnell's opportunity and confidential information to ZN, ARP engaged in willful, wanton, or reckless misconduct and/or bad faith under R.C. §1335.11(D) in order to deprive O'Donnell of its commissions.

### First Claim
### (Violation of R.C. §1335.11(D))

33. This is a statutory claim for violation of R.C. §1335.11(D).

34. O'Donnell here adopts by reference and reaffirms the averments contained above in paragraphs 1 through 32.

35. Defendant's failure to pay commissions due under the Comp Agreements by purporting to terminate the Comp Agreements and "transferring" the sales to ZN constitutes willful, wanton, or reckless misconduct or bad faith and violated R.C. §1335.11(D).

36.     O'Donnell has been damaged by Defendants' violation of R.C. §1335.11(D) in an amount to be determined at trial but exceeding $25,000 and is entitled to treble damages and attorneys' fees.

### Second Claim
### (Breach of Contract)

37.     This is a claim for breach of the NDA.

38.     O'Donnell here adopts by reference and reaffirms the averments contained above in paragraphs 1 through 36.

39.     The NDA was a valid contract between O'Donnell and ARP.

40.     O'Donnell performed all of its duties under the NDA.

41.     ARP breached the NDA by disclosing confidential information to ZN and causing ZN to utilize the confidential information.

42.     ZN violated the NDA by knowingly utilizing the confidential information provided pursuant to the NDA.

43.     O'Donnell has been damaged by Defendants' breaches of the NDA in an amount to be determined at trial but exceeding $25,000.

### Third Claim
### (Unjust Enrichment)

44.     This is a claim for unjust enrichment.

45.     O'Donnell here adopts by reference and reaffirms the averments contained above in paragraphs 1 through 43.

46.     O'Donnell conferred extensive benefits on Defendants through its work including the information provided under the NDA.

47.     Defendants had knowledge of the benefits that the received from O'Donnell.

48.    Retention of those benefits by Defendants without payment is unjust under the circumstances.

49.    Defendants have been unjustly enriched, and O'Donnell has been damaged by Defendants' unjust enrichment in an amount to be determined at trial but exceeding $25,000.

**Fourth Claim**
**(Misappropriation of Trade Secrets under R.C. §§ 1333.61 to 1333.69)**

50.    This is a claim for misappropriation of trade secrets under R.C. §§ 1333.61 to 1333.69.

51.    O'Donnell here adopts by reference and reaffirms the averments contained above in paragraphs 1 through 49.

52.    The confidential information disclosed by O'Donnell under the NDA constituted trade secrets under R.C. § 1333.61(D).  Both ARP and ZN knew that the disclosure and/or use of O'Donnell's trade secrets constituted a misappropriation under R.C. § 1333.61(B).

53.    O'Donnell has been damaged by Defendants' misappropriating its trade secrets in an amount to be determined at trial but exceeding $25,000.

54.    Defendants acted willfully and maliciously in misappropriating O'Donnell's trade secrets.  As a result, O'Donnell may recover punitive or exemplary damages in an amount not to exceed three times its actual damages plus its attorneys' fees pursuant to R.C. § 1333.63(B).

WHEREFORE, O'Donnell respectfully requests the Court to enter judgment in its favor against Defendants on O'Donnell's First Claim for treble the damages caused by their violation of R.C. §1335.11(D) plus attorneys' fees; on O'Donnell's Second Claim for

the damages caused by Defendants' breach of the NDA; on O'Donnell's Third Claim for the damages caused by Defendants' unjust enrichment; and on O'Donnell's Fourth Claim for the damages caused by Defendants' willfully and maliciously misappropriating its trade secrets plus punitive damages for three times the amount of its actual damages and its attorneys' fees.   O'Donnell further requests that the Court order Defendants to pay the costs of this action and such other relief as the Court deems just and proper.

Respectfully submitted,

W. Evan Price, II        (0056134)
Law Office of W. Evan Price II, LLC
P.O. Box 20244
Columbus, Ohio 43220-0244
(614) 734-8347
(614) 467-3952 (facsimile)
eprice@epricelaw.com

*Counsel for Plaintiff,*
*O'Donnell Medical Industries, Inc.*

Plaintiff hereby demands a jury on all issues triable to a jury under Ohio law.

W. Evan Price, II        (0056134)

- 10 -

## NON-DISCLOSURE AGREEMENT

THIS AGREEMENT (the "**Agreement**") is entered into on this _20_ day of _May 2016_ by and between _O'Donnell Medical_, located at _451 Sportsman Rd O'side_ ( the "**Disclosing Party**"), and _Animal reference Pathology_ with and address at _525 E 4500 S F 2u_ (the "**Recipient**" or the "**Receiving Party**"). _Salt Lake City, Utah_

The Recipient hereto desires to participate in discussions regarding _Reference lab partnership_ (the "**Transaction**"). During these discussions, Disclosing Party may share certain proprietary information with the Recipient. Therefore, in consideration of the mutual promises and covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.     **Definition of Confidential Information.**

    (a)     For purposes of this Agreement, "**Confidential Information**" means any data or information that is proprietary to the Disclosing Party and not generally known to the public, whether in tangible or intangible form, whenever and however disclosed, including, but not limited to: (i) any marketing strategies, plans, financial information, or projections, operations, sales estimates, business plans and performance results relating to the past, present or future business activities of such party, its affiliates, subsidiaries and affiliated companies; (ii) plans for products or services, and customer or supplier lists; (iii) any scientific or technical information, invention, design, process, procedure, formula, improvement, technology or method; (iv) any concepts, reports, data, know-how, works-in-progress, designs, development tools, specifications, computer software, source code, object code, flow charts, databases, inventions, information and trade secrets; and (v) any other information that should reasonably be recognized as confidential information of the Disclosing Party. Confidential Information need not be novel, unique, patentable, copyrightable or constitute a trade secret in order to be designated Confidential Information. The Receiving Party acknowledges that the Confidential Information is proprietary to the Disclosing Party, has been developed and obtained through great efforts by the Disclosing Party and that Disclosing Party regards all of its Confidential Information as trade secrets

    (b)     Notwithstanding anything in the foregoing to the contrary, Confidential Information shall not include information which: (i) was known by the Receiving Party prior to receiving the Confidential Information from the Disclosing Party; (b) becomes rightfully known to the Receiving Party from a third-party source not known (after diligent inquiry) by the Receiving Party to be under an obligation to Disclosing Party to maintain confidentiality; (c) is or becomes publicly available through no fault of or failure to act by the Receiving Party in breach of this Agreement; (d) is required to be disclosed in a judicial or administrative proceeding, or is otherwise requested or required to be disclosed by law or regulation, although the requirements of paragraph 4 hereof shall apply prior to any disclosure being made; and (e) is or has been independently developed by employees, consultants or agents of the Receiving Party without violation of the terms of this Agreement or reference or access to any Confidential Information.

2.     **Disclosure of Confidential Information.**

    From time to time, the Disclosing Party may disclose Confidential Information to the Receiving Party. The Receiving Party will: (a) limit disclosure of any Confidential Information to its directors, officers, employees, agents or representatives (collectively "**Representatives**") who have a need to know such Confidential Information in connection with the current or contemplated business relationship between the parties to which this Agreement relates, and only for that purpose; (b) advise its Representatives of the proprietary nature of the Confidential Information and of the obligations set forth

**Exhibit 1**

Downloaded from http://www.tidyforms.com

in this Agreement and require such Representatives to keep the Confidential Information confidential; (c) shall keep all Confidential Information strictly confidential by using a reasonable degree of care, but not less than the degree of care used by it in safeguarding its own confidential information; and (d) not disclose any Confidential Information received by it to any third parties (except as otherwise provided for herein).

Each party shall be responsible for any breach of this Agreement by any of their respective Representatives.

3. **Use of Confidential Information.**

The Receiving Party agrees to use the Confidential Information solely in connection with the current or contemplated business relationship between the parties and not for any purpose other than as authorized by this Agreement without the prior written consent of an authorized representative of the Disclosing Party. No other right or license, whether expressed or implied, in the Confidential Information is granted to the Receiving Party hereunder. Title to the Confidential Information will remain solely in the Disclosing Party. All use of Confidential Information by the Receiving Party shall be for the benefit of the Disclosing Party and any modifications and improvements thereof by the Receiving Party shall be the sole property of the Disclosing Party. Nothing contained herein is intended to modify the parties' existing agreement that their discussions in furtherance of a potential business relationship are governed by Federal Rule of Evidence 408.

4. **Compelled Disclosure of Confidential Information.**

Notwithstanding anything in the foregoing to the contrary, the Receiving Party may disclose Confidential Information pursuant to any governmental, judicial, or administrative order, subpoena, discovery request, regulatory request or similar method, provided that the Receiving Party promptly notifies, to the extent practicable, the Disclosing Party in writing of such demand for disclosure so that the Disclosing Party, at its sole expense, may seek to make such disclosure subject to a protective order or other appropriate remedy to preserve the confidentiality of the Confidential Information; provided in the case of a broad regulatory request with respect to the Receiving Party's business (not targeted at Disclosing Party), the Receiving Party may promptly comply with such request provided the Receiving Party give (if permitted by such regulator) the Disclosing Party prompt notice of such disclosure. The Receiving Party agrees that it shall not oppose and shall cooperate with efforts by, to the extent practicable, the Disclosing Party with respect to any such request for a protective order or other relief. Notwithstanding the foregoing, if the Disclosing Party is unable to obtain or does not seek a protective order and the Receiving Party is legally requested or required to disclose such Confidential Information, disclosure of such Confidential Information may be made without liability.

5. **Term.**

This Agreement shall remain in effect for a two-year term (subject to a one year extension if the parties are still discussing and considering the Transaction at the end of the second year). Notwithstanding the foregoing, the parties' duty to hold in confidence Confidential Information that was disclosed during term shall remain in effect indefinitely.

6. **Remedies.**

Both parties acknowledge that the Confidential Information to be disclosed hereunder is of a unique and valuable character, and that the unauthorized dissemination of the Confidential

2

Downloaded from http://www.tidyforms.com

Information would destroy or diminish the value of such information. The damages to Disclosing Party that would result from the unauthorized dissemination of the Confidential Information would be impossible to calculate. Therefore, both parties hereby agree that the Disclosing Party shall be entitled to injunctive relief preventing the dissemination of any Confidential Information in violation of the terms hereof. Such injunctive relief shall be in addition to any other remedies available hereunder, whether at law or in equity. Disclosing Party shall be entitled to recover its costs and fees, including reasonable attorneys' fees, incurred in obtaining any such relief. Further, in the event of litigation relating to this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and expenses.

7.  **Return of Confidential Information.**

Receiving Party shall immediately return and redeliver to the other all tangible material embodying the Confidential Information provided hereunder and all notes, summaries, memoranda, drawings, manuals, records, excerpts or derivative information deriving there from and all other documents or materials ("Notes") (and all copies of any of the foregoing, including "copies" that have been converted to computerized media in the form of image, data or word processing files either manually or by image capture) based on or including any Confidential Information, in whatever form of storage or retrieval, upon the earlier of (i) the completion or termination of the dealings between the parties contemplated hereunder; (ii) the termination of this Agreement; or (iii) at such time as the Disclosing Party may so request; provided however that the Receiving Party may retain such of its documents as is necessary to enable it to comply with its document retention policies. Alternatively, the Receiving Party, with the written consent of the Disclosing Party may (or in the case of Notes, at the Receiving Party's option) immediately destroy any of the foregoing embodying Confidential Information (or the reasonably nonrecoverable data erasure of computerized data) and, upon request, certify in writing such destruction by an authorized officer of the Receiving Party supervising the destruction).

8.  **Notice of Breach.**

Receiving Party shall notify the Disclosing Party immediately upon discovery of any unauthorized use or disclosure of Confidential Information by Receiving Party or its Representatives, or any other breach of this Agreement by Receiving Party or its Representatives, and will cooperate with efforts by the Disclosing Party to help the Disclosing Party regain possession of Confidential Information and prevent its further unauthorized use.

9.  **No Binding Agreement for Transaction.**

The parties agree that neither party will be under any legal obligation of any kind whatsoever with respect to a Transaction by virtue of this Agreement, except for the matters specifically agreed to herein. The parties further acknowledge and agree that they each reserve the right, in their sole and absolute discretion, to reject any and all proposals and to terminate discussions and negotiations with respect to a Transaction at any time. This Agreement does not create a joint venture or partnership between the parties. If a Transaction goes forward, the non-disclosure provisions of any applicable transaction documents entered into between the parties (or their respective affiliates) for the Transaction shall supersede this Agreement. In the event such provision is not provided for in said transaction documents, this Agreement shall control.

10.  **Warranty.**

3

Downloaded from http://www.tidyforms.com

Each party warrants that it has the right to make the disclosures under this Agreement. NO WARRANTIES ARE MADE BY EITHER PARTY UNDER THIS AGREEMENT WHATSOEVER. The parties acknowledge that although they shall each endeavor to include in the Confidential Information all information that they each believe relevant for the purpose of the evaluation of a Transaction, the parties understand that no representation or warranty as to the accuracy or completeness of the Confidential Information is being made by either party as the Disclosing Party. Further, neither party is under any obligation under this Agreement to disclose any Confidential Information it chooses not to disclose. Neither Party hereto shall have any liability to the other party or to the other party's Representatives resulting from any use of the Confidential Information except with respect to disclosure of such Confidential Information in violation of this Agreement.

11. **Miscellaneous.**

(a) This Agreement constitutes the entire understanding between the parties and supersedes any and all prior or contemporaneous understandings and agreements, whether oral or written, between the parties, with respect to the subject matter hereof. This Agreement can only be modified by a written amendment signed by the party against whom enforcement of such modification is sought.

(b) The validity, construction and performance of this Agreement shall be governed and construed in accordance with the laws of _____ OHIO _____ (state) applicable to contracts made and to be wholly performed within such state, without giving effect to any conflict of laws provisions thereof. The Federal and state courts located in _____ OHIO _____ (state) shall have sole and exclusive jurisdiction over any disputes arising under the terms of this Agreement.

(c) Any failure by either party to enforce the other party's strict performance of any provision of this Agreement will not constitute a waiver of its right to subsequently enforce such provision or any other provision of this Agreement.

(d) Although the restrictions contained in this Agreement are considered by the parties to be reasonable for the purpose of protecting the Confidential Information, if any such restriction is found by a court of competent jurisdiction to be unenforceable, such provision will be modified, rewritten or interpreted to include as much of its nature and scope as will render it enforceable. If it cannot be so modified, rewritten or interpreted to be enforceable in any respect, it will not be given effect, and the remainder of the Agreement will be enforced as if such provision was not included.

(e) Any notices or communications required or permitted to be given hereunder may be delivered by hand, deposited with a nationally recognized overnight carrier, electronic-mail, or mailed by certified mail, return receipt requested, postage prepaid, in each case, to the address of the other party first indicated above (or such other addressee as may be furnished by a party in accordance with this paragraph). All such notices or communications shall be deemed to have been given and received (a) in the case of personal delivery or electronic-mail, on the date of such delivery, (b) in the case of delivery by a nationally recognized overnight carrier, on the third business day following dispatch and (c) in the case of mailing, on the seventh business day following such mailing.

(f) This Agreement is personal in nature, and neither party may directly or indirectly assign or transfer it by operation of law or otherwise without the prior written consent of the other party, which consent will not be unreasonably withheld. All obligations contained in this Agreement shall extend to and be binding upon the parties to this Agreement and their respective successors, assigns and designees.

4

Downloaded from http://www.nayforms.com

(g)     The receipt of Confidential Information pursuant to this Agreement will not prevent or in any way limit either party from: (i) developing, making or marketing products or services that are or may be competitive with the products or services of the other; or (ii) providing products or services to others who compete with the other.

(h)     Paragraph headings used in this Agreement are for reference only and shall not be used or relied upon in the interpretation of this Agreement.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first above written.

Disclosing Party                                                                 Receiving Party

By _____                          By _____
Name: Steven DeMaio                                            Name: DAVID W. GARDINER
Title: Owner                                                           Title: CEO + CMO

5

Downloaded from http://www.tidyforms.com



Exhibit 2

ANIMAL
REFERENCE
PATHOLOGY

# Revised Sales & Marketing
# Compensation Proposal

Exhibit 2

## Compensation Plan

- Agree to a mutually beneficial Sales & Marketing compensation plan

- Cash flow critical for ARP survival

- Economies of scale begin at ~$250,000 - $500,000 in clinical sales
  - Costs include: regents, equipment payments, service contracts, headcount

- We propose a slightly tiered comp plan

- We are convinced Steve and Sean are 100% dedicated to the success of ARP



# Proposed Sales & Marketing Compensation Plan

## Annual Sales:

$0 - $250,000 = 10% commission*

$250,001 - $500,000 = 12% commission*

$500,000 – no limit = 15% commission*

- Contingent on agreed upon pricing*

- These commissions are inclusive of any incentives paid to 3rd parties e.g. Universal, Henry Schein, etc.*

- Antech SG&A 8.4% of sales(2015 financial data – no sales & marketing breakout)

- IDEXX Sales & Marketing 18.7% of sales



# Equity and/or guaranteed payout

- Payout based on the %s below after all debt service is paid off
- 1% achieved for each $1,000,000 in new sales up to a total of 5% or $5,000,000 in new sales
- 1% achieved for each $2,000,000 in new sales up to a total of 5% or $10,000,000 in additional new sales
- In summary, at $15,000,000 in new sales you would have 10% equity/guaranteed payout



ANIMAL REFERENCE PATHOLOGY

Everett,

Thanks for putting this together for all of us! We appreciate your continued confidence and support and together we will all be blazing new trails for ARP.

Look forward to catching up with everyone soon.

Thanks again
Sean O. Flynn

Sent from my iPhone

On May 4, 2017, at 10:57 AM, Everett Smith <everett@animalreferencepathology.com> wrote:

Steve and Sean,
Here is our proposed compensation plan with the caveat to review at the end of the year.

For TVC clients you will be paid a 7.5% commission on total sales for all new clients up to $500,000 annually. Once the $500,000 has been met you will be paid 10% commission on all sales from $1 forward. ARP will pay the 2% TVC membership fee.

For other new business let's do a 12% commission on all sales to keep things simple.

Commissions will begin effective April 1, 2017 and will be paid once a month either by check or direct deposit (your choice).

As discussed other strategic partnerships may require different pricing.

Looking forward to growing our business and having you guys blaze the trail! Let's get together in the next few weeks to come up with some strategic goals.

Let us know what you think.

Everett

**From:** Everett Smith
**Sent:** Friday, April 28, 2017 10:18 AM
**To:** Steve DeMaio <steve@animalreferencepathology.com>; 'Sean Flynn' <sflynn@Fuse.net>; Sean Flynn <sean@animalreferencepathology.com>
**Cc:** 'animalreferencepathology.com-Gardiner, David (david@animalreferencepathology.com)' <david@animalreferencepathology.com>
**Subject:** RE: Comp Plan talking points

Gentlemen,
Great call and thanks for taking the time to talk. See the notes below in red. We will touch base with the ARP compensation proposal next week (tentatively on Wednesday).
Everett

**Exhibit 3**

**From:** Everett Smith
**Sent:** Friday, April 28, 2017 6:54 AM
**To:** Steve DeMaio <steve@animalreferencepathology.com>; 'Sean Flynn' <sflynn@Fuse.net>; Sean Flynn <sean@animalreferencepathology.com>
**Cc:** 'animalreferencepathology.com-Gardiner, David (david@animalreferencepathology.com)' <david@animalreferencepathology.com>
**Subject:** Comp Plan talking points

Steve and Sean,
Here are some talking points for our discussion this morning. My goal for this meeting is for all of us to gain a better understanding of what a fair and equitable compensation plan would look like and then I can draft a more formal proposal that we can review next week. In addition, we can define roles and responsibilities, identify and remove any obstacles that are hindering the sales process, and get your feedback from the clients you have spoken too. David and I feel very comfortable letting you drive TVC sales and want to assist you as much or as little as you'd like. There is a lot of opportunity out there and it is ours for the taking.

1. Commissions begin April 1, 2017 Agreed
2. What activities are covered in the commission %
   a. Is the TVC 2% included or excluded? Excluded per Sean and Steve
   b. What about any other % payments to distributors or vendors? Unknown – referral fees come out of Steve & Sean commissions
   c. Travel? Covered by Steve & Sean
   d. Marketing materials and marketing material development? Smaller stuff Steve and Sean
   e. Marketing campaigns – constant contact, postcards, etc. Major campaigns ARP
3. What is the commission % for existing ARP clients that are TVC members, i.e. Olympus Cove, Mayfair, Powder Paws? 0%
   a. The TVC agreement cannibalized existing sales with these clients
4. What are your short-term goals (monthly) that would determine whether we are succeeding? Steve wants to defer until after speaking with Chad at TVC. We'll get started on some goals in May
5. Commission % for existing ARP clients (defined as using ARP at least once a year)? Meaning if we gave you a list of 1,000 clients that at one time used us? Non-TVC Commission
6. Should the TVC commission % based on which pricing structure we agree upon – keeping the current pricing the same (and implementing the inbound shipping fee for the under $50 packages), tiered pricing, or if we increase the current pricing). Steve and Sean to speak with Chad and Rich. Everett to provide some financial guidelines.
7. What are the metrics we should use to decide whether or not we stay with TVC? Let's put a framework and goals into place now so we can objectively review the TVC account over the next few months/year. TBD once Steve and Sean speak with Chad and Rich and get survey results
8. Are you comfortable determining commission % for other strategic partnerships as they occur or would you prefer to determine a commission % as we do this iteration? On case by case basis
9. What support do you need from Everett? Pricing guidelines, Financial reporting, starter kits send out info, send Everett emails with data requests so that we can set up regular reports to answer sales questions
10. What support do you need from David? Bundle options for TVC promos, occasional brainstorming session, access to LigoLab

Everett to provide a pricing framework – floor pricing
Everett to provide proposed comp plan next week
Steve to send Everett the LLC info for payment and whether check or direct deposit

Everett

# NATIONWIDE VETERINARY REFERENCE LAB

- **NO CONTRACTS**
- **AMAZING PRICES**
- **RESULTS BY 8AM**
- **SOFTWARE INTEGRATIONS**

GET STARTED WITH A NEW CUSTOMER KIT

**STEP 1: REQUEST A KIT**

**STEP 2: SHIP YOUR SAMPLE**

**STEP 3: EXPERT TESTING**

**STEP 4: RESULTS BY 8AM!**

Amazing Prices, No Negotiations Necessary.
Oh, and No Contracts. What are you waiting for?

CONTACT US FOR MORE INFO

**Exhibit 4**

## Team



**Dr. Andrew Loar, DVM, DACVIM (IM and Oncology) – Co-CMO, Co-Founder and ZNHub Lab Director**

Andy was raised in a traveling military (USAF) family and moved nearly a dozen times before finishing high school in Atlanta Georgia. He attended McGill University, in Montreal, for his undergraduate studies and graduated from the University of Georgia with his DVM (1979). He completed an internship at Louisiana State University and his residency in oncology at the Animal Medical Center in New York City.

He has served on the clinical staffs at the veterinary schools of Virginia Tech and the University of Wisconsin, as well as the West Los Angeles Veterinary Medical Center. He received dual board certification with the American College of Veterinary Internal Medicine (ACVIM: Internal Medicine {'84} and Oncology {'94}). He was the first veterinary oncologist to practice in southern California and operated oncology referral clinics in Los Angeles, Orange and San Diego counties from 1985-1995. Dr Loar completed additional training in clinical pathology at Oklahoma State University.

In 2000, after returning to the Animal Medical Center (NY) as staff clinical cytologist, he subsequently co-founded ALX Laboratory, a small, ambitious commercial reference pathology laboratory in Manhattan, which was purchased by IDEXX in 2011. From 2012 until 2017 he was the clinical laboratory director and consulting cytologist at STAT Veterinary Lab, a facility originally created as the in-clinic reference laboratory of the Veterinary Specialty Hospital in San Diego. Veterinary Specialty Hospital merged with other specialty hospitals in 2015 to become Ethos Veterinary Health, with more than 17 clinics in 6 states and Hong Kong; Dr Loar became VP of Laboratories for Ethos Veterinary Health. In 2016 he implemented a second core veterinary reference laboratory for Ethos in the Boston area.

During his more than 30 years in various veterinary diagnostic spaces he has served as a cytologist and oncology/internal medicine consultant at Veterinary Reference Laboratories, Professional Animal Laboratory (now ANTECH), IDEXX Laboratories, Ethos Diagnostics and Animal Reference Pathology (ARP). Andy recently moved to Louisville, KY to oversee all clinical operations of the ZNHub. He is otherwise a frequent world traveler, has many fine leather-bound books and knows people you know.

**Dr. David Gardiner, DVM, MS, DACVP – Co-CMO, Chief Pathology Officer and Co-Founder**



Dr. Gardiner, AKA DG1, received his Doctor of Veterinary Medicine (DVM) degree from Cornell University and completed his veterinary anatomic pathology residency and Masters of Science (MS) degree at Colorado State University and is board certified in veterinary anatomic pathology by the American College of Veterinary Pathologists. After pathology residency training, Dr Gardiner dove head first into surgical pathology at IDEXX Laboratories West Sacramento lab and eventually became the regional head of anatomic pathology for Canada and the western United States for IDEXX. Wanting to try and do things a different way in the veterinary diagnostic lab industry, with Mr Smith (ZNLabs CFO), Dr. Gardiner and Mr. Smith purchased the Animal Reference Pathology (www.animalreferencepathology.com) division of ARUP Laboratories.

The idea for ZNLabs developed out of running Animal Reference Pathology, interactions with Dr Loar (ZNLabs Co-CMO), Mr Gersholowitz (ZNLabs CEO) and a desire to offer veterinarians a viable 3rd option in the veterinary reference laboratory space. No one was doing anything about it and despite prior unsuccessful attempts (AVRL), we decided to make it happen.

A member of the American Veterinary Medical Association, the American College of Veterinary Pathologists and the International Society of Veterinary Dermatopathology, Dr Gardiner is particularly interested in pathology laboratory management, ocular pathology, dermatopathology, and oncologic pathology. Dr. Gardiner is an adjunct professor in the School of Veterinary Medicine at Utah State University where Animal Reference Pathology sponsors an annual veterinary spelling bee. Close your eyes and can you spell intussusception?



**Everett Smith, MBA – CFO and Co-Founder**



Everett Smith is a business professional with more than 15 years experience in corporate accounting and finance working for Fortune 500 companies in the high tech and medical device industries. As a collaborative team member in a variety of leadership roles at health care products provider Covidien, Everett established an exemplary track record in forecasting, planning and analysis, acquisition integration, investment analysis, and pricing. Management responsibilities included financial reporting for Covidien's Respiratory & Monitoring Solutions global business unit and the US Patient Monitoring division. Everett holds a B.S. in accounting from the University of Utah and earned an MBA at the University of Denver.

Click the links below are for our simplified test menu and requisition forms – practically everything you need in a short & easy format!

## Test Menu:

**ZNLabs Test Menu, Jan 2019** (no prices, not password protected)

**ZNLabs Test Menu with Prices, Jan 2019** (password protected, please call for password)

## Requisition/Submission Forms:

**ZNLabs Requisition Forms, Jan 2019** (no prices, not password protected, fillable pdf)

**ZNLabs Requisition Forms with Prices, Jan 2019** (password protected, please call for password)

All forms with **prices** are **password protected**. Please contact us to confirm that you are a veterinarian or veterinary practice to receive the password.

## ZNGuide & Directory of Services (Reference Document):

**ZNGuide No Prices 2018**  The ZNGuide includes Test Menu, Shipping Instructions, ZNPortal Instructions and Directory of Services (Update Coming Soon)

**ZNGuide including Prices 2018** (same as above but with prices, please call for password) (Update Coming Soon)

**ZNLabs Directory of Services, Jan 2019** (Reference Document with test components, methodology, sample requirements, & turnaround time).

# Notes

Our sister lab, **Animal Reference Pathology**, or ARP, does all Histopathology for ZNLabs. We love ARP!

We do everything the big labs do, we just make it simpler, we're friendly, our prices are amazing – and no contracts!

<u>Brief Explanation of the Menu</u>

**The Blue Tests**: The most common tests you run, simplified, priced for each patient order. See sheet above for reference

**The Green Tests**: More extensive list with somewhat common tests including Histo, Cyto, Micro, PCR, etc. Pricing is transparent, as shown 😊

**The Orange Tests**: Some more esoteric tests, not used very often, but available. In fact, just let us know if you need something not shown, we'll get it done!

Please call us (1.888.ZNL.ZNLA or 1.888.965.9652) with any questions, we love to help 😊

info@znlabs.com                 1.888.965.9652
                                              1.888.ZNL.ZNLA

300 High Rise Dr. Suite 300
Louisville, Kentucky 40213

Copyright © 2017 ZNLabs, LLC - All Rights Reserved

Welcome to ZNLabs!

**AP**

# Techcyte Launches Vetcyte, an AI-Powered Digital Diagnostics Platform

January 21, 2019

 

**RELATED TOPICS**

Health

BusinessWire

BusinessWire: Medical

Utah

Business

LINDON, Utah--(BUSINESS WIRE)--Jan 21, 2019--Techcyte, a leading developer of AI-based image analysis solutions for the diagnostics industry, has launched Vetcyte, an AI-powered digital diagnostics platform at VMX 2019. Initially, the Vetcyte platform supports the following canine-and-feline diagnostic tests:

10-minute Fecal Ova and Parasite 10-minute Digital 6-part Blood Differential Same-day FNA analysis (through a collaboration with ZN Labs)

"The Vetcyte AI-based image analysis platform is the future of digital diagnostics in the veterinary industry. Whether you are running a small veterinary clinic or a large lab, the Vetcyte platform gives you fast, accurate results and significantly lowers your costs!" said Ben Cahoon, COO of Techcyte.

The Vetcyte platform is a complete solution for sample preparation, scanning, analysis, and reporting. For the preparation of fecal samples, the system includes the Vetcyte ParaPro, a no-mess device that uses a non-toxic Apafix float solution. The ParaPro device can be used with either a passive or centrifugal float process.

Techcyte has collaborated closely with Motic Instruments to image the veterinary samples for AI analysis. With the click of a button, blood and fecal samples are automatically scanned, uploaded to Vetcyte, and analyzed using Vetcyte's advanced deep-learning image analysis technologies.

Through its collaboration with ZN Labs, the Vetcyte digital pathology platform quickly connects veterinarians to experts for same-day FNA analysis. The system can also be used to connect to experts at ZN Labs for secondary opinions on parasites and blood results.

With Vetcyte, veterinarians:

Virtually eliminate the mess of fecal tests with a patented ParaPro prep system Improve patient satisfaction by delivering accurate results within 10 minutes Digitally connect veterinary technicians with lab experts at ZN Labs for consultations

The Motic scanner, ParaPro device, and Vetcyte tests can be purchased directly from Techcyte. The Vetcyte tests are priced per test and can be purchased in packs to receive volume discounts.

About Techcyte

Headquartered in Orem, Utah, Techcyte, Inc. was founded in 2013 as a technology transfer from the University of Utah with a mission to lower healthcare costs through artificial intelligence. Techcyte uses the power of deep machine learning to perform image analysis of

  

162 Used

**Bad Credit? No Credit? No Problem, You Can Get Approved!**

Luxury Auto Sales
4880 Sinclair Rd, Columbus, OH 43229
(614) 368-0168

**Trending on AP News**

Europe court orders Italy to pay damages to Amanda Knox

Why Venezuela military leaders are standing behind Maduro

Native American activist says he forgives boys in videos

by Taboo

**Exhibit 5**

whole slide images. Image analysis is required for widespread adoption of digital pathology in research, pharma, human, air quality, and veterinary diagnostic testing.

For additional information, visit www.techcyte.com.

View source version on businesswire.com:https://www.businesswire.com/news/home/20190121005088/en/

CONTACT: Press Contacts:

Ben Cahoon

ben.cahoon@techcyte.com

801-980-0414

KEYWORD: UNITED STATES NORTH AMERICA FLORIDA UTAH

INDUSTRY KEYWORD: TECHNOLOGY VENTURE CAPITAL SOFTWARE HEALTH PROFESSIONAL SERVICES CONSUMER VETERINARY GENERAL HEALTH PETS

SOURCE: Techcyte, Inc.

Copyright Business Wire 2019.

PUB: 01/21/2019 08:00 AM/DISC: 01/21/2019 08:01 AM

http://www.businesswire.com/news/home/20190121005088/en



**Harvard Medical School**

Registration open for Harvard Medical School's spring executive education programs.

🌐 cloud.landing.hms.harv...

**Visit Site**

PAID FOR BY LENDINGTREE

# How to pay off your house ASAP (It's so simple)



Americans could save thousands by taking advantage of this government program

lendingtree

**Video shows brutality of knife attack...**

COLUMBUS, Ohio (AP) — A newly released video shows the brutality of an Ohio inmate's knife attack on four other

2 days ago

## Ad Content

**The Richest Songwriter Of All Time Is Not Who You Thought**

Promoted: Finance101