**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| O'Donnell Medical Industries, Inc., | : |
| Plaintiff, | : Case No. 1:19-cv-00214 |
| v. | : Judge Michael R. Barrett |
| Animal Reference Pathology, LLC, *et al.*, | : |
| Defendants. | : |

**OPINION AND ORDER**

This matter is before the Court on the Motion for Summary Judgment filed by Defendants Animal Reference Pathology, LLC ("ARP") and ZNLabs, LLC ("ZNLabs") (collectively, "Defendants"). (Doc. 10).

**I.   BACKGROUND**[1]

O'Donnell was an Ohio company that existed, during the relevant time, to receive sales commission payments that Steven DeMaio and Sean Flynn hoped to earn when they worked as ARP sales representatives. (Doc. 11, Steven DeMaio Depo. 8:15-11:8); (Doc. 12, Sean Flynn Depo. 131:4-134:22). Mr. DeMaio and Mr. Flynn are the principals of O'Donnell. (Doc. 11-8). Mr. DeMaio and Mr. Flynn each worked briefly for a veterinary supply company, Henry Schein Inc. ("Henry Schein"), in approximately 2016, but had no other experience with the veterinary market when they reached out to ARP in hopes of working together. (Doc. 11, DeMaio Depo. 11:9-19, 12:16-19, 13:3-14). More specifically,

---

[1] The Court took parts of Defendants' Motion for Summary Judgment's facts section to create this background section, as the Court finds Defendants' account to be accurate.

neither Mr. DeMaio nor Mr. Flynn had any experience with veterinary reference laboratory services. (*Id.*, 16:22-17:7; 19:24-20:6); (Doc. 12, Flynn Depo. 15:16-18).

ARP was a veterinary reference laboratory company based in Salt Lake City, Utah. (Doc. 4 ¶ 2). Veterinary reference laboratories provide laboratory testing services to veterinary clinics. For example, if a veterinary clinic needed blood, tissue, or fecal samples analyzed for their patients, the clinic could ship the samples to ARP, ARP would conduct the analysis, and ARP would return the results to clinic. (Doc. 1-1 ¶ 2); (Doc. 4 ¶ 2); (Doc. 11, DeMaio Depo. 20:7-14). Dr. David Gardiner, a well-known veterinarian, led ARP and is experienced in the veterinary reference laboratory industry. (Doc. 12, Flynn Depo. 144:7-20). O'Donnell acknowledges that, in the industry, "there was nobody that was on par with David Gardiner." *Id.*

ZNLabs is a veterinary reference laboratory in Louisville, Kentucky that provides diagnostic services in veterinary medicine. (Doc. 1-1 ¶4); (Doc. 4 ¶ 4). Dr. Gardiner and Frank Everett Smith co-founded ZNLabs on July 18, 2017. (Doc. 1-1 ¶4); (Doc. 4 ¶ 4).

While working for Henry Schein, Mr. DeMaio and Mr. Flynn realized what many in the veterinary market had previously realized: two major competitors dominated the veterinary reference laboratory industry and veterinarians nationwide wanted the option of using a third competitor. (Doc. 11, DeMaio Depo. 201:13-202:12); (Doc. 12, Flynn Depo. 18:6-19; 30:6-22; 35:2-37:7); *cf.* (Doc. 12, Flynn Depo. 50:13-25) ("Everybody had tried to crack into the top three."). Mr. DeMaio and Mr. Flynn approached ARP to inquire about working as sales representatives for ARP to help grow ARP into a viable third competitor. (Doc. 11, DeMaio Depo. 48:22-49:9). ARP was receptive, and, in May 2016, O'Donnell asked ARP to execute a Non-Disclosure Agreement ("NDA"). (*Id.*, 51:8-22);

2

(Doc. 11-5). The NDA defined "confidential information" as "proprietary" information that "has been developed and obtained through great efforts" by O'Donnell, and expressly excluded information that was already known to ARP or that could be publicly known or developed. (Doc. 11-5 PageID 398).

After entering into the NDA, O'Donnell discussed the payment structure for Mr. DeMaio and Mr. Flynn to earn sales commissions, on new business that they brought in, with ARP. The parties agreed that commissions would begin to accrue effective April 1, 2017. *See* (Doc. 1-1 PageID 24-29); (Doc. 4 ¶ 23); (Doc. 11, DeMaio Depo. 35:14-36:4, 37:19-39:16). Although the parties did not sign a formal sales agreement establishing compensation rates for Mr. DeMaio and Mr. Flynn, the emails attached to the Complaint set forth the parties' understanding. (Doc. 1-1 PageID 24-29). In particular, the parties understood that:

- ARP's pre-existing customers were excluded from the commission arrangement (Doc. 11, DeMaio Depo. 24:18-20);
- O'Donnell "would be paid commissions on business that [it] brought in, and there would be the potential for ownership once [it] hit certain numbers" (*Id.*, 23:20-24:1);
- O'Donnell would receive no salary, advances, or reimbursement for expenses—its only compensation was to be commission-based (*Id.*, 24:7-25, 25:18-26:3); and
- If O'Donnell failed to bring in new business, O'Donnell's commissions would be zero. (*Id.*, 24:12-14).

Mr. DeMaio and Mr. Flynn subsequently agreed to forego any commissions stemming from one of the relationships that ARP asked O'Donnell to develop, *i.e.*, the

3

Veterinary Cooperative ("TVC"), until that relationship became profitable.[2] (*Id.*, 48:9-21; 165:13-24). The TVC was the major lead that ARP explicitly asked Mr. DeMaio and Mr. Flynn to pursue. (*Id.*, 171:13-20).

The relationship between O'Donnell and ARP did not become profitable during the eighteen months they worked together, and, on November 1, 2017, ARP terminated the relationship. (*Id.*, 166:10-19); (Doc. 11-23). ARP detailed its reasons for the termination in an email—the lack of revenue growth for the TVC, lack of new business for ARP, and overall poor performance by O'Donnell—and offered to meet to discuss the termination decision. (Doc. 11, DeMaio Depo. 170:19-171:2); (Doc. 11-23). O'Donnell declined ARP's offer to meet and discuss. (Doc. 11, DeMaio Depo. 170:19-171:2). Instead, O'Donnell threatened litigation in a November 7, 2017 email. (*Id.*, 171:24-173:14) ("Q. So your immediate reaction to the 11-1 email was to threaten litigation. Is that fair? A. Yes."); (Doc. 11-24).

O'Donnell subsequently filed its Complaint in this matter in the Clermont County Court of Common Pleas. (Doc. 1-1). O'Donnell brings four counts: a violation of Ohio Revised Code § 1335.11 ("Payment of commission due sales representative"), breach of contract, unjust enrichment, and misappropriation of trade secrets. *Id.* Defendants timely removed the matter. *Id.* Defendants later timely filed their Motion for Summary Judgment. (Doc. 10). O'Donnell did not respond.[3]

---

[2] ARP's sales reports, which Mr. DeMaio and Mr. Flynn testified that they have no reason to doubt, show that, at most, O'Donnell might have accrued $365.95 in commissions for the TVC by October 2017. (Doc. 12, Flynn Depo. 124:19-130:2, 151:18-153:1); (Doc. 13-4); (Doc. 13-5); (Doc. 16-1). ARP terminated O'Donnell the next month.

[3] At a March 2020 status conference with the Court, two months after Defendants filed their Motion for Summary Judgment, O'Donnell's counsel reported that he could no longer reach his client.

4

## II. ANALYSIS

### a. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id.* On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden of production, the non-moving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49. A court cannot grant a motion for summary judgment simply because the motion is unopposed; rather, the court must review the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists. *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 629 (6th Cir. 2014); *accord Smith v. Hudson*, 600 F.2d 60, 64 (6th Cir. 1979) ("A party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant."); *cf.* S.D. Ohio Civ. Rule 7.2(a)(2) ("Failure to file a memorandum in opposition may result in the granting of any

5

motion that would not result directly in entry of final judgment or an award of attorneys' fees."). A court will not "sua sponte comb the record" from the nonmoving party's perspective and may reasonably rely on the moving party's "unrebutted recitation of the evidence, or pertinent portions thereof, in reaching a conclusion that certain evidence and inferences from evidence demonstrate facts which are 'uncontroverted.'" *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 410 (6th Cir. 1982). If such evidence supports a conclusion that there is no genuine issue of material fact, the court should determine that the moving party is entitled to judgment as a matter of law. *Id.*

### b. Count One

Under the Ohio Sales Representative Commission Act, principals must pay commissions to their sales representatives on a timely basis. Ohio Rev. Code § 1335.11. "Upon the termination of a contract between a principal and a sales representative . . ., the principal shall pay the sales representative all commissions due the sales representative at the time of the termination within thirty days of the termination and shall pay the sales representative all commissions that become due after the termination within thirteen days of the date on which the commissions become due." *Id.* at § 1335.11(C). "A principal who fails to timely pay a sales representative all commissions due is 'liable in a civil action for exemplary damages in an amount not to exceed three times the amount of the commissions owed to the sales representative if the sales representative proves that the principal's failure . . . constituted willful, wanton, or reckless misconduct or bad faith.'" *Volunteer Energy Servs., Inc. v. Option Energy, LLC*, 579 F. App'x 319, 328 (6th Cir. 2014) (quoting Ohio Rev. Code § 1335.11(D)).

6

Assuming that a principal and sales representative relationship is present between O'Donnell and Defendants, a fact that Defendants do not appear to dispute, Mr. DeMaio and Mr. Flynn have not identified a specific amount of commissions owed to O'Donnell by Defendants. (Doc. 11, DeMaio Depo. 25:7-13, 26:4-27:24; 43:8-48:8; 206:15-207:19) (testifying that he could not identify an amount of commissions that O'Donnell was owed, and had not reviewed any of the financial data produced by ARP in discovery to determine what commissions were owed, if any); (Doc. 11-4); (Doc. 12, Flynn Depo. 23:3-25:25) (admitting that he had "hypothetical" ideas about categories of potential compensation but hadn't "taken the time to review" the financial data produced by Defendants in discovery to identify any specific amounts allegedly owed). Mr. DeMaio conceded that he had nothing more than a "guesstimate" as to the amount of commissions owed and could not point to any data, documents, or factual information to support his "guesstimate." (Doc. 11, DeMaio Depo. 25:7-13, 26:4-27:24; 43:8-48:8; 206:15-207:19). O'Donnell has not identified a witness, expert or otherwise, who could testify as to the amount of O'Donnell's allegedly unpaid commissions or produced any evidence in support of any amount of unpaid commissions. Moreover, and contrary to Mr. Flynn's deposition testimony, nothing in the documents evidencing the parties' agreed-on commission arrangement guaranteed O'Donnell a minimum term as ARP's sales representative, or suggested that O'Donnell would be entitled to post-employment commissions. *Compare* (Doc. 12, Flynn Depo. 37:17-41:9), *with* (Doc. 1-1 PageID 24-29); (Doc. 4 ¶ 23). O'Donnell did not allege, and Mr. DeMaio and Mr. Flynn did not testify, that the parties discussed or agreed to post-employment commission payments.

7

Defendants did not violate the Ohio Sales Representative Commissions Act, as Defendants did not fail to pay O'Donnell or withhold any commissions, because Defendants did not owe O'Donnell any commissions, and O'Donnell was not entitled to post-termination commissions. *See Weiper v. W.A. Hill & Assoc.*, 104 Ohio App. 3d 250, 259, 661 N.E.2d 796, 802 (1995) (rejecting a claim for post-employment commissions absent an express agreement to pay such commissions, and stating that permitting the indefinite accrual of commissions, in the absence of an express agreement to do so, "would be tantamount to giving the employee a perpetual equitable share of that company's earnings"); *see also Davis & Tatera, Inc. v. Gray-Syracuse, Inc.*, 796 F. Supp. 1078, 1083-85 (S.D. Ohio 1992) (same); *cf. Volunteer Energy Servs., Inc. v. Option Energy, LLC*, No. 1:11-CV-554, 2012 WL 6084158, at *10 (W.D. Mich. Dec. 6, 2012), *amended*, No. 1:11-CV-554, 2013 WL 1500433 (W.D. Mich. Apr. 10, 2013), *and aff'd*, 579 F. App'x 319 (6th Cir. 2014).

### c. Counts Two and Four

Defendants combine their analysis regarding O'Donnell's claims for breach of contract and misappropriation of trade secrets, and the Court will too. The Court will also begin its analysis with O'Donnell's misappropriation of trade secrets claim. To prevail on a misappropriation of trade secret claim, the plaintiff must show by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret. *Hoover Transp. Serv., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003) (citing GTI *Corp. v. Calhoon*, 309 F. Supp. 762, 767 (S.D. Ohio 1969)). A "trade secret" under Ohio law is defined as:

> information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following: (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* (citing Ohio Rev. Code § 1333.61(D)).

The Ohio Supreme Court has adopted a six-factor test to help determine the existence of a trade secret: "(1) [t]he extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information." *State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 1997-Ohio-75, 80 Ohio St. 3d 513, 525, 687 N.E.2d 661, 672 (citing *Pyromatics, Inc. v. Petruziello*, 7 Ohio App. 3d 131, 134, 454 N.E.2d 588, 592 (1983)).

The information that O'Donnell argues constitutes confidential information or trade secrets is described in O'Donnell's written interrogatory responses. (Doc. 11-8). O'Donnell asserts that "[t]he names, positions, areas of responsibility, and contact information" for six individuals in the veterinary industry are "confidential information" protected by the NDA. *Id.*; (Doc. 11, DeMaio Depo. 71:17-72:24; 152:11-153:7; 197:25-198:13.2). The Court will discuss each of the six individuals in turn.

9

The first individual is Steve Ager of National Veterinary Associates ("NVA"). (Doc. 11-8). It is "common knowledge" in the veterinary industry that NVA is a large owner of veterinary clinics. (Doc. 11, DeMaio Depo. 92:8-25). Mr. DeMaio and Mr. Flynn did not know Mr. Ager, or anything about Mr. Ager, before they began working with ARP. (*Id.*, 85:12-89:9); (Doc. 12, Flynn Depo. 57:2-11). Mr. DeMaio and Mr. Flynn looked up the NVA leadership on the internet, entered Mr. Ager's email into an email marketing database that ARP paid for, and used that contact to set up a meeting between ARP's principals and Mr. Ager. O'Donnell provided no other information, or insight, about Mr. Ager or NVA to anyone at ARP. (Doc. 11, DeMaio Depo. 85:12-89:9; 97:24-98:23); (Doc. 12, Flynn Depo. 57:2-11). Ultimately, NVA never reached a business arrangement with either ARP or ZNLabs before O'Donnell's termination. (Doc. 11, DeMaio Depo. 97:2-23). Moreover, O'Donnell has not offered any evidence suggesting that NVA entered any business relationship with either ARP or ZNLabs after O'Donnell's termination.

The second and third individuals are Craig Coughlin and George Henriques from Patterson Animal Health ("Patterson"). It is well known that Patterson is a significant player in the veterinary health industry. (*Id.*, 98:24-105:9). Neither Mr. DeMaio nor Mr. Flynn had ever spoken to Craig Coughlin or George Henriques, or knew anything about either of them, before beginning to work for ARP. (*Id.*); (Doc. 12, Flynn Depo. 57:20-58:13). After becoming a sales representative for ARP, Mr. DeMaio found email addresses for Mr. Henriques and Mr. Coughlin through public internet searches, and sent Mr. Coughlin a "cold" email identifying himself as sales representatives for ARP. (Doc. 11, DeMaio Depo. 98:24-105:9). Mr. Coughlin responded to the outreach, and further conversations occurred. However, Patterson never reached a business arrangement with

10

either ARP or ZNLabs. (*Id.*, 109:2-111:25.4). Moreover, as the specific business arrangement that ARP discussed with Patterson fell outside of ARP's normal business offerings, ARP and O'Donnell never reached a commission agreement as to Patterson. (*Id.*, 161:2-19).

The fourth individual is Francis Dirksmeier of Henry Schein. Mr. DeMaio and Mr. Flynn worked for Henry Schein when they began working with ARP. Mr. Dirksmeier was an executive at Henry Schein, but Mr. DeMaio and Mr. Flynn did not know him personally. (*Id.*, 113:1-114:2); (Doc. 12, Flynn Depo. 58:18-59:1). Mr. Flynn requested a meeting with Mr. Dirksmeier to discuss ARP and followed it up with some ARP marketing material; though, Mr. Flynn admits that he purposely portrayed ARP as an unaffiliated third-party vendor to avoid signaling to his then-employer that he had ties to ARP. (Doc. 12, Flynn Depo. 61:25-64:7); (Doc. 12-2); (Doc. 12-3). O'Donnell cannot identify any business negotiations of any kind that occurred—before or after O'Donnell's termination—between Henry Schein or its successor, Covetrus, and ARP or ZNLabs. (Doc. 11, DeMaio Depo. 117:13-118:13).

The fifth and six individuals are Allison Morris and Rich Morris of the TVC. The TVC is a cooperative of independent veterinary clinics that work together to enhance their buying power. (*Id.*, 118:14-20.5). O'Donnell had never heard of TVC before working with ARP. (*Id.*, 118:21-119:1). O'Donnell did not have any contact information for anyone affiliated with TVC until ARP gave it to O'Donnell. (*Id.*, 119:20-128:13); (Doc. 11-12); (Doc. 11-13). During an initial trial period with TCV, the one—of five—veterinary clinics that sent laboratory samples to ARP for analysis was an existing ARP customer. (Doc. 11, DeMaio Depo. 133:5-136:5); (Doc. 11-16). Despite the disappointing trial period, ARP

11

and TVC entered a one-year agreement under which TVC gave ARP access to contact information for all of its 1,500 members to use for ARP's marketing purposes. (Doc. 11, DeMaio Depo. 136: 6-138:14); (Doc. 11-17); (Doc. 11-18). However, the results of O'Donnell's efforts with TVC members were poor. (Doc. 11, DeMaio Depo. 142:4-7). For example, after generating 27 leads at a TVC trade show, Mr. DeMaio and Mr. Flynn were unable to get any of those leads to send a sample test kit to ARP for analysis. (*Id.*, 143:2-145:6); (Doc. 11-19); (Doc. 11-20); (Doc. 12, Flynn Depo. 124:19-130:2, 151:18- 153:1); (Doc. 13-4); (Doc. 13-5); (Doc. 16-1). By late October 2017, it was clear that the TVC effort had failed to generate any profits, and O'Donnell offered to forego commissions on the meager volume of TVC business until such time as that arrangement became more profitable. (Doc. 11, DeMaio Depo. 48:9-21; 165:13-24).

In sum, five of the six individuals whose names, positions, areas of responsibility, and contact information O'Donnell contends are confidential information that O'Donnell gave to ARP were people O'Donnell first learned of while working for ARP, and none of the contact information O'Donnell gathered was non-public, as it was all found through simple internet searches or given to O'Donnell by ARP. Further, and after a review of the deposition transcripts, the only other information that O'Donnell appears to identify as possibly being confidential information or a trade secret is its general marketing strategy of trying to break into the veterinary reference laboratory market as a third competitor. However, Mr. DeMaio and Mr. Flynn acknowledge that this was not a novel marketing strategy. (*Id.*, 201:13-202:12); (Doc. 12, Flynn Depo. 18:6-19; 30:6-22; 35:2-37:7).

The allegations in the Complaint relating to ZNLabs allege that ARP provided confidential information that it received from O'Donnell to ZNLabs to "facilitate the

exploitation of the opportunity O'Donnell presented to ARP by utilizing the contacts to potential customers developed by O'Donnell to sell diagnostic laboratory services." (Doc. 1-1 ¶ 28). In depositions, however, Mr. DeMaio admitted that he has no evidence to support those allegations, and could not identify confidential information that ARP got from O'Donnell and gave to ZNLabs. (Doc. 11, DeMaio Depo. 198:14-201:2; 199:20-201:2; 203:8-204:9); *see* (Doc. 12, Flynn Depo. 40:1-45:15) (admitting that he has "nothing more than my assumptions, and… my speculation that information that we shared and opportunities that we brought to the table under one umbrella would have easily transferred to another umbrella").

The Court finds that there is no evidentiary support for O'Donnell's misappropriation of trade secrets claims against Defendants, as O'Donnell has not identified the existence of any confidential information or trade secrets. *See Hoover Transp. Serv., Inc*, 77 F. App'x at 782; *State ex rel. The Plain Dealer*, 1997-Ohio-75, 80 Ohio St. 3d at 525, 687 N.E.2d at 672; *see also Heartland Home Finance, Inc. v. Allied Home Mortgage Capital Corp.*, 258 F. App'x 860, 862-63 (6th Cir. 2008) (upholding grant of summary judgment because sales leads constituted "information that is openly available on the market at minimal cost," and "not the type of data Ohio courts have considered to be trade secrets"). As of May 2016, when the parties signed the NDA, O'Donnell had not developed proprietary information relevant to the veterinary reference laboratory business. (Doc. 11, DeMaio Depo. 59:24-64:21). Once the parties signed the NDA, Mr. DeMaio and Mr. Flynn concede that any further investigation or customer development activities they performed were on behalf of ARP. (Doc. 11, DeMaio Depo. 55:21-58:9); (Doc. 12, Flynn Depo. 54:9-25). Additionally, there is no evidence that

13

ZNLabs received any confidential information or trade secrets belonging to O'Donnell from ARP. (Doc. 11, DeMaio Depo. 199:20-201:2; 203:8-204:9); (Doc. 12, Flynn Depo. 40:1-45:15). As the Court finds that O'Donnell has not identified any confidential information or trade secrets, the Court also finds that O'Donnell has not demonstrated any unauthorized use of confidential information or trade secrets. *See Hoover Transp. Serv., Inc*, 77 F. App'x at 782.

Turning to O'Donnell's breach of contract claim, the Court finds that O'Donnell's breach of contract claim fails, as O'Donnell provides no evidence that ARP breached the NDA by disclosing confidential information to ZNLabs or that ZNLabs received or used any confidential information. Accordingly, dismissal of these claims is proper.

    **d.**    **Count Three**

Even assuming that O'Donnell's unjust enrichment claim is not barred by its breach of contract claim or preempt by its misappropriate of trade secrets claim, the claim fails, as O'Donnell does not identify a way in which Defendants were enriched, unjustly or otherwise, by O'Donnell. For instance, ARP did not obtain new business, or new intelligence as to potential or actual customers or business opportunities, as a result of O'Donnell's efforts. O'Donnell fails to present any evidence that would allow a trier of fact to conclude that Defendants were unjustly enriched, and dismissal of O'Donnell's unjust enrichment claim is warranted.

III. **CONCLUSION**

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Motion for Summary Judgment (Doc. 10) is **GRANTED**. This matter is **CLOSED** and **TERMINATED** from the active docket of this Court.

**IT IS SO ORDERED.**    _/s Michael R. Barrett_____
Michael R. Barrett, Judge
United States District Court